J-S24032-21

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN THE INTEREST OF: V.M., A MINOR | : : : : : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF: G.M., FATHER | : : : : : : | |
| | : | No. 273 WDA 2021 |

Appeal from the Order Entered February 19, 2021
In the Court of Common Pleas of Allegheny County Family Court at
No(s): CP-02-AP-0000015-2020

BEFORE:   DUBOW, J., KING, J., and STEVENS, P.J.E.*

MEMORANDUM BY STEVENS, P.J.E.:              **FILED: AUGUST 13, 2021**

Appellant, G.M. ("Father"), appeals from the order entered on February 19, 2021, in the Court of Common Pleas of Allegheny County, which granted the petition of Allegheny County Office of Children, Youth, and Families ("CYF" or the "Agency") to involuntarily terminate Father's parental rights to his minor, dependent daughter, V.M., born in November 2009 ("Child"), pursuant to the Adoption Act, 23 Pa.C.S.A. § 2511(a)(2), (5), (8), and (b).[1]  After a careful review, we affirm.

_____

* Former Justice specially assigned to the Superior Court.

[1] Pursuant to the same order, the court terminated the parental rights of Mother, L.L.R. a/k/a L.L.L. ("Mother").  Mother did not file a separate appeal, and she is not a participating party to the instant appeal.

The trial court has summarized the relevant facts and procedural history

as follows:

> [Child] was born [in November 2009]. The child's mother is L.L.R., who is also known as L.L.L. On April 30, 2018, [Mother] was convicted of 3rd degree murder and is serving a sentence of 18-36 years in a state correctional institution. [Mother] has not visited the child, and child does not wish to visit her mother. [Mother] has not maintained consistent contact with CYF.
>
> The child's father is G.M. Father was acknowledged by acknowledgment of paternity on November 11, 2009. [CYF] was aware of this family since 2011 due to [Mother]'s unaddressed substance abuse, mental health, housing, and domestic violence issues.
>
> The [A]gency became involved with the family again in November of 2012. The [A]gency learned that L.L.R. was homeless and requesting the removal of the minor from her care. The agency implemented in-home services to assist the family.
>
> On March 14, 2013, [Mother] contacted CYF and requested the child be removed from her care. The child was placed into foster care on March 15, 2013….CYF filed a Petition for Dependency on March 25, 2013[,] and the child was adjudicated dependent on May 8, 2013.
>
> The child was eventually returned to [F]ather's care on June 27, 2014; however, she was removed from her father's care on July 14, 2014. The child's permanency goal was changed to Permanent Legal Custodianship [("PLC")] and her PLC placement was finalized on January 23, 2015.[2] The child's case in Juvenile Court was closed on January 23, 2015.
>
> On October 29, 2015, the child's legal custodian filed an Application to file a Private Dependency, due to the minor's out-

_____

2 Paternal step-grandmother, A.L., with whom Child had previously been placed, served as Child's permanent legal custodian. N.T., 2/18/21, at 12. We observe that, in at least one instance, A.L. is alternately referred to as maternal grandmother. **See** TPR Exhibit 3, Shelter Care Order, 8/31/18. While admitted as CYS Exhibit 2 on the record at the termination hearing, this exhibit is included in the electronic certified record as TPR Exhibit 3, and we shall refer to it as such.

of-control behaviors. The petition was withdrawn on November 5, 2015, and the child's case in Juvenile Court was closed on that date.

On August 4[], 2018, the child's legal custodian filed for a modification of the permanent legal custody order due to the child's ongoing out-of-control behaviors. At a review hearing on August 29, 2018, the legal custodian advised she was no longer able to care for the child and requested her removal. The minor was ordered to be placed into foster care.

At a shelter hearing on August 31[], 2018, the child's new caregivers advised that they were not willing to be [a] placement option for the child if Father was to be involved with the minor. Due to this, the child's legal custodian advised that she was willing to care for the child until a new placement was identified. [Mother] was not a placement option as she was incarcerated in a state correctional institution for 3rd degree murder. On October [2]4, 2018, the child was placed into foster care placement for the final time.[3] She [has] not [been] returned to the care of either parent since that time.

. . .

Father was court ordered to obtain drug and alcohol treatment, to include random urine screens, and individual mental health treatment on November 20[,] 2019. Father was court ordered to locate a place in the community to visit with [C]hild on November 20[], 2019[,] and he failed to do so.

Trial Court Opinion ("T.C.O."), 4/15/21, at 4-6 (footnotes added). *See* N.T, 2/18/21, at 6-10; Stipulations, 2/19/21; TPR Exhibit 3.

---

[3] Child was again adjudicated dependent. She was placed with T.C. and S.C., with whom she had initially been placed on August 29, 2018. TPR Exhibit 3, Order of Adjudication and Disposition, 10/24/18. On February 21, 2019, the court appointed T.C. and S.C. as Child's educational and medical decision-makers. TPR Exhibit 3, Appointment of Educational and Medical Decision-Maker, 2/21/19. Subsequently, on February 19, 2020, the court appointed solely T.C. as Child's educational and medical decision-maker. TPR Exhibit 3, Appointment of Educational Decision-Maker, 2/19/20. Significantly, at the time of the hearing, Child resided solely with T.C. N.T., 2/18/21, at 13.

Thereafter, CYF filed a petition for the termination of parental rights on February 5, 2020.[4]  The court eventually held a hearing on February 18, 2021. Father was present and represented by counsel, and Child was represented by counsel from KidsVoice, appointed pursuant to Order dated and entered on February 19, 2020.[5]  CYF presented the testimony of Marci Bolger, a CYF caseworker; and Dr. Patricia Pepe, Ph.D., a licensed psychologist who the parties stipulated as an expert.  Dr. Pepe conducted individual and interactional evaluations of Child and Father, as well as an interactional evaluation of Child and her foster father.  Dr. Pepe's report was admitted without objection as CYS Exhibit 1.[6]  Additionally, Father testified on his own behalf.

By order dated February 18, 2021, and entered on February 19, 2021, the court terminated Father's parental rights.  Thereafter, on February 25, 2021, Father, through appointed counsel, filed a timely notice of appeal, as

---

[4] The court changed Child's permanent placement goal from return to parent or guardian to adoption pursuant to the order of February 19, 2021.  TPR Exhibit 3, Permanency Review Order, 2/19/20.  Father did not appeal this order.

[5] Notably, counsel for Child argued in favor of termination of parental rights. N.T., 2/18/21, at 58-59.  Counsel further submitted a brief to this Court in support of the termination of Father's parental rights.

[6] While admitted as CYS Exhibit 1 on the record at the termination hearing, this exhibit is included in the electronic certified record as TPR Exhibit 1.

J-S24032-21

well as a concise statement of errors complained of on appeal pursuant to Pa.R.A.P. 1925(a)(2)(i) and (b).

On appeal, Father raises the following issues for our review:

I. Whether the [t]rial [c]ourt committed fatal error and/or abused its discretion in finding [CYF] met their burden of proof and proved by clear and convincing evidence that the parental rights of [Father] should be terminated pursuant to 23 Pa.C.S.A. [§ 2511(a)(2), (5), (8)]?

II. Whether the [t]rial [c]ourt committed fatal error and/or abused its discretion in finding [CYF] met their burden of proof and proved by clear and convincing evidence that the parental rights of [Father] best meets the needs and welfare of the minor child pursuant to 23 Pa.C.S.A. [§ 2511(b)]?

Father's Brief at 5 (suggested answers omitted).

Initially, we note that in matters involving the involuntary termination of parental rights, our standard of review is as follows:

The standard of review in termination of parental rights cases requires appellate courts "to accept the findings of fact and credibility determinations of the trial court if they are supported by the record." *In re Adoption of S.P.*, [616 Pa. 309, 325, 47 A.3d 817, 826 (2012)]. "If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion." *Id.* "[A] decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will." *Id.* The trial court's decision, however, should not be reversed merely because the record would support a different result. *Id.* at 827. We have previously emphasized our deference to trial courts that often have first-hand observations of the parties spanning multiple hearings. *See In re R.J.T.*, [608 Pa. 9, 26-27, 9 A.3d 1179, 1190 (2010)].

*In re T.S.M.*, 620 Pa. 602, 628, 71 A.3d 251, 267 (2013)).  "The trial court is free to believe all, part, or none of the evidence presented and is likewise

- 5 -

free to make all credibility determinations and resolve conflicts in the evidence." ***In re M.G. & J.G.***, 855 A.2d 68, 73-74 (Pa.Super. 2004) (citation omitted). "[I]f competent evidence supports the trial court's findings, we will affirm even if the record could also support the opposite result." ***In re Adoption of T.B.B.,*** 835 A.2d 387, 394 (Pa.Super. 2003) (citation omitted).

Moreover, the termination of parental rights is governed by Section 2511 of the Adoption Act, 23 Pa.C.S.A. §§ 2101-2938, and requires a bifurcated analysis of the grounds for termination followed by the needs and welfare of the child.

> Our case law has made clear that under Section 2511, the court must engage in a bifurcated process prior to terminating parental rights. Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in Section 2511(a). Only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis pursuant to Section 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child. One major aspect of the needs and welfare analysis concerns the nature and status of the emotional bond between parent and child, with close attention paid to the effect on the child of permanently severing any such bond.

***In re L.M.***, 923 A.2d 505, 511 (Pa.Super. 2007) (citations omitted). We have defined clear and convincing evidence as that which is so "clear, direct, weighty and convincing as to enable the trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue." ***In re C.S.***, 761 A.2d 1197, 1201 (Pa.Super. 2000) (*en banc*) (quoting ***Matter of Adoption of Charles E.D.M., II***, 550 Pa. 595, 601, 708 A.2d 88, 91 (1998)).

In the case *sub judice*, the trial court terminated Father's parental rights pursuant to 23 Pa.C.S.A. § 2511(a)(2), (5), (8), and (b). We have long held that, in order to affirm a termination of parental rights, we need only agree with the trial court as to any one subsection of Section 2511(a), as well as Section 2511(b). ***See In re B.L.W.***, 843 A.2d 380, 384 (Pa.Super. 2004) (*en banc*). Here, we analyze the court's termination decree pursuant to Section 2511(a)(2) and (b), which provide as follows:

> **(a) General rule.--**The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:
>
> . . .
>
>> (2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.
>
> . . .
>
> **(b) Other considerations.--**The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S.A. § 2511(a)(2), and (b) (bold in original).

With regard to termination of parental rights pursuant to Section 2511(a)(2), we have indicated:

> In order to terminate parental rights pursuant to 23 Pa.C.S.A. § 2511(a)(2), the following three elements must be met: (1) repeated and continued incapacity, abuse, neglect or refusal; (2) such incapacity, abuse, neglect or refusal has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being; and (3) the causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied.

*In re Adoption of M.E.P.*, 825 A.2d 1266, 1272 (Pa.Super. 2003) (citation omitted). "The grounds for termination due to parental incapacity that cannot be remedied are not limited to affirmative misconduct. To the contrary, those grounds may include acts of refusal as well as incapacity to perform parental duties." *In re Adoption of C.D.R.*, 111 A.3d 1212, 1216 (Pa.Super. 2015) (quoting *In re A.L.D.*, 797 A.2d 326, 337 (Pa.Super. 2002)). "Parents are required to make diligent efforts towards the reasonably prompt assumption of full parental responsibilities….[A] parent's vow to cooperate, after a long period of uncooperativeness regarding the necessity or availability of services, may properly be rejected as untimely or disingenuous." *In re A.L.D.*, 797 A.2d at 340 (quotation marks and quotation omitted).

Instantly, in finding grounds for termination of Father's parental rights, including pursuant to subsection (a)(2), the trial court reasoned:

> The family plan goals for Father were completion of domestic violence treatment, mental health treatment, and drug and alcohol counseling. The [c]ourt made a finding that Father had ongoing issues with drugs and alcohol from when the case was previously opened. Father was ordered to be evaluated and

- 8 -

begin treatment. Father began treatment in October 2020 and did not complete by the time of the TPR hearing. The [c]ourt further finds that Father did not submit to his random drug screens that were ordered on November 20, 2019, at the Permanency Review Hearing. Ms. Bolger testified that Father did not submit to random urine screens because he admitted to her that he was still using marijuana on a regular basis.

Though there was testimony on cross-examination that Father had sent a picture to Ms. Bolger of a medical marijuana card that he obtained in January of 2021[, t]hat fact is unpersuasive to the [c]ourt as Father failed to comply and did not submit to the drug screens as was ordered by the [c]ourt over a year prior to obtaining the medical card. Therefore, the [c]ourt finds that Father did not meet his drug and alcohol goal ordered by the [c]ourt.

The goal of domestic violence counseling was also an issue in this case and something the [c]ourt ordered the [f]ather to address as a family goal. Father testified that he believed he completed a domestic violence course in 2014. Father began domestic violence counseling in 2014 at the Women's Center and Shelter of Greater Pittsburgh ("WC&S"), but [he] never successfully completed [the counseling program]. Father told caseworker Bolger that he completed the domestic violence counseling, when in fact he did not. Ms. Bolger then reached out to WC&S to verify and learned that he did not complete [it]. Ms. Bolger then provided Father with the number of the WC&S so that he could schedule the classes, which did not occur.

The [c]ourt ordered Father to undergo a mental health evaluation and treatment. Father did not undergo a mental health evaluation. Father sent pictures to caseworker Bolger that he was attending Family Links; [however,] to her understanding, he received only a drug and alcohol evaluation from the picture he sent. The [c]ourt heard testimony from Dr. Patricia Pepe, Ph.D., a licensed psychologist and expert who performed evaluations in this case. Dr. Pepe evaluated Father on September 22, 2021. Dr. Pepe recalled that Father had a violent past and had been incarcerated in the past for assault. Dr. Pepe testified Father has been psychiatrically hospitalized at WPIC more than 10 times, but [he] wasn't involved in treatment services at the time of the evaluation. Dr. Pepe diagnosed Father with post-traumatic stress disorder and a history of antisocial personality disorder. Dr. Pepe opined that Father had a tendency for persecutory thinking and paranoid ideation.

- 9 -

Although Father made an attempt to comply with treatment by using Family Links, the [c]ourt found that the Family Links services did not meet the type/level of care prescribed. Further, it was revealed by Father's own admission that he didn't begin his Family Links therapy until after the TPR was filed in this matter. The [c]ourt relied heavily on the opinion of Dr. Pepe that Father struggles to meet his own daily needs. He is still psychiatrically and behaviorally unfit to provide [Child] the structure she requires and currently receives through her foster father. The [c]ourt, therefore, finds that Father did not meet his mental health goals.

The [c]ourt also ordered visitation to occur between the child and Father. The [c]ourt accepted the testimony of Ms. Bolger who had records detailing from 2019 the visitations. Initially, Father made adequate efforts with his efforts to meet this goal. Father consistently attended his visits March 3, 2019, through May 13, 2019, all but one of the visits, which was canceled by the foster mother. Father had in-person visits at CYF Offices on June 23, 2019, and June 30, 2019.

Unfortunately, Father's visitation became inconsistent and the location of the visits continued to be an obstacle. From August 18 through November 9, 2019, nearly three months later, [F]ather had no visits with the child. Father scheduled the visits on a Saturday, which conflicted with dance classes for the child on that day of the week. Visitations then ceased from December 17, 2019, to October 16, 2020, because Father did not identify a public location for the visits to occur, which he acknowledged as his failed responsibility. Father incredibly testified that the reason the visits didn't occur was due to a miscommunication with the caseworker.

Ms. Bolger testified that this [c]ourt ordered [*sic*] to conduct a home assessment of Father's residence. The [c]ourt accepted the testimony of Ms. Bolger that Father's residence was unacceptable to have home visits as there were holes in the ceiling and Playboy magazines strewn across the coffee table. Father later remedied his housing issues and visitations resumed. Although Father identified suitable housing for himself, the [c]ourt noted that Father expressed a great deal of concern about his apartment location because "it's in the midst of drug traffic and violence" when interviewed by Dr. Pepe. Father admitted that he tends not to go outside because he frequently heard gun shots in the neighborhood area. It is the [c]ourt's opinion that the housing goal has not been met and the home is not safe for [Child].

Father has never independently parented [Child] for an adequate amount of time to demonstrate parental responsibility. CYF has been involved with the family since 2011 for the very same issues the [c]ourt heard about throughout the life of this case. The child returned to Father in 2014 under court supervision and the case was closed in 2015. During this time frame[,] there was conflicting evidence as to whom [*sic*] actually cared for the day[-]to[-]day needs of the child. Unfortunately, CYF needed to reopen the case because Father was still not in a position to care for [Child,] and, to date[, he] has not rectified the circumstances that caused CYF to become involved with the family in the first place.

The [c]ourt finds that Father did not meet his goals. It is, therefore, the opinion of the court that CYF met their burden by clear and convincing evidence that Father did not remedy the issues that led to the removal of [Child] and that termination of Father's parental rights is in the best interests of [Child] pursuant to 23 Pa.C.S.A. [§§ 2511(a)(2), (5), (8)].

T.C.O. at 7-11 (citations omitted).

Father, however, argues that CYF failed to present clear and convincing evidence to establish grounds for termination pursuant to subsection (a)(2). He asserts that he remedied the conditions related to Child's dependency. Father's Brief at 11-12. Noting concerns related to substance abuse, mental health, and domestic violence, Father states:

[Father] contends that he remedied the issues that led to dependency and that he is capable of caring for [Child]. [Father] is engaged in mental health and drug and alcohol treatment and Family Links. The only drug that [Father] uses is marijuana, [for] which he had a medical marijuana card that permits his usage. [Father] contends that he completed domestic violence classes in 2014 and that he has not been involved in any domestic violence incidents since taking the classes. [Father] contends that he can meet the needs of [Child] as he has housing sufficient to raise [Child] in and would ensure that she continues in her therapy if returned to him.

- 11 -

*Id.* at 12.

A review of the record supports the trial court's finding of grounds for termination under Section 2511(a)(2). The record reveals that Father failed to complete his goals aimed at reunification and lacked the ability to parent Child. As such, CYF expressed continuing concerns related to Father.

When asked about CYF's concerns as to Father's ability to parent, caseworker Marci Bolger testified, "[Father] has never parented [Child]. The case was closed out as a PLC in 2015, and[,] when it reopened, [Father] still was not in a position to care for [Child]. He has not rectified the circumstances that ha[ve] made the safety concerns not there [*sic*]." N.T., 2/18/21, at 19. Likewise, regarding Father, Dr. Patricia Pepe testified, "I don't see him as having the individual stability or parental responsibility at this time to parent [Child]." *Id.* at 33. Dr. Pepe continued, "I had concern about [Father], you know, even though he's made tremendous progress, his capacity to parent [Child]." *Id.* at 34. She referenced Father's self-acknowledged concerns with his housing,[7] as well as issues related to persecutory thinking and paranoid ideation. *Id.* at 36. As such, Dr. Pepe recommended adoption as being in Child's best interests. *Id.* at 40.

---

[7] As to Father's description of his neighborhood, Dr. Pepe testified, "He had expressed a great deal of concern about his apartment because he said it's in the midst of drug traffic and violence. So, he tends not to go outside, and frequently hears shooting in the area, and generally described his neighborhood as being dangerous." *Id.* at 32-33.

We conclude the trial court did not abuse its discretion in ordering termination under Section 2511(a)(2). The record substantiates the conclusion that Father's repeated and continued incapacity, abuse, neglect, or refusal has caused Child to be without essential parental control or subsistence necessary for her physical and mental well-being. *See In re Adoption of M.E.P.*, 825 A.2d at 1272. Moreover, Father cannot or will not remedy this situation. *See id*. As we discern no abuse of discretion or error of law, we do not disturb the trial court's findings.

As this Court has stated, "[A] child's life cannot be held in abeyance while a parent attempts to attain the maturity necessary to assume parenting responsibilities. The court cannot and will not subordinate indefinitely a child's need for permanence and stability to a parent's claims of progress and hope for the future." *In re Adoption of R.J.S.*, 901 A.2d 502, 513 (Pa.Super. 2006).

As noted above, in order to affirm a termination of parental rights, we need only agree with the trial court as to any one subsection of Section 2511(a) before assessing the determination under Section 2511(b), and we, therefore, need not address any further subsections of Section 2511(a). *In re B.L.W.*, 843 A.2d at 384.

We next determine whether termination was proper under Section 2511(b). As to Section 2511(b), our Supreme Court has stated as follows:

> [I]f the grounds for termination under subsection (a) are met, a court "shall give primary consideration to the

- 13 -

developmental, physical and emotional needs and welfare of the child."  23 Pa.C.S.[A.] § 2511(b).  The emotional needs and welfare of the child have been properly interpreted to include "[i]ntangibles such as love, comfort, security, and stability."  *In re K.M.*, 53 A.3d 781, 791 (Pa.Super. 2012).  In *In re E.M. [a/k/a E.W.C. & L.M. a/k/a L.C., Jr.]*, [533 Pa. 115, 123, 620 A.2d 481, 485 (1993)], this Court held that the determination of the child's "needs and welfare" requires consideration of the emotional bonds between the parent and child.  The "utmost attention" should be paid to discerning the effect on the child of permanently severing the parental bond.  *In re K.M.*, 53 A.3d at 791.  However, as discussed below, evaluation of a child's bonds is not always an easy task.

*In re T.S.M.*, 620 Pa. at 628, 71 A.3d at 267.  "In cases where there is no evidence of any bond between the parent and child, it is reasonable to infer that no bond exists.  The extent of any bond analysis, therefore, necessarily depends on the circumstances of the particular case."  *In re K.Z.S.*, 946 A.2d 753, 762-63 (Pa.Super. 2008) (citation omitted).

When evaluating a parental bond, "[T]he court is not required to use expert testimony.  Social workers and caseworkers can offer evaluations as well.  Additionally, Section 2511(b) does not require a formal bonding evaluation."  *In re Z.P.*, 994 A.2d 1108, 1121 (Pa.Super. 2010) (citations omitted).

Moreover,

While a parent's emotional bond with his or her child is a major aspect of the Section 2511(b) best-interest analysis, it is nonetheless only one of many factors to be considered by the court when determining what is in the best interest of the child.

[I]n addition to a bond examination, the trial court can equally emphasize the safety needs of the child, and should also consider the intangibles, such as the love,

> comfort, security, and stability the child might have with the foster parent….

*In re Adoption of C.D.R.*, 111 A.3d at 1219 (quoting *In re N.A.M.*, 33 A.3d 95, 103 (Pa.Super. 2011)) (quotation marks and quotation omitted).

In determining that termination of Father's parental rights favors Child's needs and welfare under Section 2511(b), the trial court stated:

> This [c]ourt conducted a parent-child bond analysis in this case. The [c]ourt is not required to use expert testimony and may rely upon the evaluation of social workers and caseworkers as well. The extent of the bond-effect analysis necessarily depends on the circumstances of the particular case.
>
> The court analyzed the absence of any significant bond between [Child] and Father. The parent-child relationship is non-existent. The [c]ourt accepted the opinion of Dr. Pepe that[,] while [Child] and Father enjoy each other, "there is no primary bonding with him." There was conflicting testimony that [Child] briefly stayed with Father in 2014, but[,] according to Dr. Pepe's interactions with [Child], she learned from her that the two never lived together. Further, according to Dr. Pepe's own observations of Father and [Child], it did not appear to her that the two were having visits with one another prior to Father's six-month lapse in visits. Ultimately, Dr. Pepe opined that she just doesn't believe that Father is capable to handle his own daily needs let alone provide the structure for [Child]. Furthermore, [Child] does not consider Father a priority in her life due to a lack of having any relationship with him because of their past. The [c]ourt agrees. There is no doubt that severing the parental rights of Father would be in the best interests of [Child].
>
> The [c]ourt also examined the established bond between the foster father, [T.C.,] and [Child] in making its decision to terminate the parental rights of Father. It was clear to the [c]ourt that the foster father provided a stable environment that fostered the love and emotional support the child requires.
>
> [Child] had her own psychiatric issues and was at one time hospitalized. She exhibited out of control behaviors. According to Dr. Pepe, the child suffered these traumas due to her moves from different homes. [Child] has moved five times and according

to Dr. Pepe, "she's really ready for permanency." Dr. Pepe noted the "tremendous progress" she has made. Dr. Pepe noted the fact that [Child] has gone from being out of control to now being on the high honor roll in school. And[,] although [Child] had previously been diagnosed by Dr. Pepe with trauma and stressor related issues, she no longer exhibits these symptoms. Dr. Pepe expressed her opinion that [Child] is positively expressive, mature for her age, and a delightful young lady.

The [c]ourt finds this to be true due to the positive affect the foster home provides the child. The [c]ourt weighed heavily the testimonial evidence about [Child]'s relationship with [her foster father]. The [c]ourt finds [foster father] to be a highly responsible adult and father figure equipped to provide the love and support that [Child] desires and needs. [Foster father], who is employed as a school resource officer, is extremely supportive of [Child]. He encourages and motivates [Child]. All of this has made for a positive structure for her positive behavioral functioning.

[Child] refers to foster father [] as "T.T." Dr. Pepe observed and testified that [Child] and [foster father] have a very nice relationship. The two share a lot of activities and interests. Dr. Pepe opined that [Child] is extremely attached to [foster father]. [Child] told Dr. Pepe that she wants to stay with "T.T." for the rest of her days[,] or at least until college. Further, it was Dr. Pepe's opinion that [foster father] has been very supportive, encouraged [Child], and exhibits excellent parenting skills. It was clear to Dr. Pepe that [Child] views [foster father] as her permanent psychological parent.

Additionally, the [c]ourt weighed the expert testimony of Dr. Pepe[,] who opined that she has no concerns that foster father would be able to meet [Child]'s needs. [Child] would be devastated if she had to leave her foster father's home. The [c]ourt agrees with Dr. Pepe's opinion that it would be "destructive" for [Child]. [Child] has made such a move forward, psychologically and behaviorally[,] since being in her current foster home. Furthermore, from a psychological viewpoint, permanency is a priority, and[,] therefore[,] severing the ties with the biological father would not have a detrimental effect on the child.

Therefore, the evidence established that termination will be able to provide [Child] with much needed stability and permanence at her age[,] and this [c]ourt concludes that the

developmental, physical, and emotional needs and welfare of Child would be best served by terminating Father's parental rights under 2511(b).

T.C.O. at 11-15 (citations omitted).

Father, however, argues that his relationship with Child should not be severed. He highlights that Dr. Pepe indicated that both Father and Child desire to maintain a relationship with one another and that this is an important relationship to maintain. Father's Brief at 17. He further notes that his failures are not relevant to this assessment. *Id.*

As to Section 2511(b), we conclude the trial court did not abuse its discretion. In describing Child's relationship with her foster father, Ms. Bolger stated, "My observation would be [that there is a] great parent/child relationship. [Child] looks to [her foster father] for basically everything." N.T., 2/18/21, at 23. Similarly, Dr. Pepe testified, "Well, they have a very nice relationship, very trusting. I mean, he's extremely supportive of her, encouraging, motivating towards her, really has developed a positive structure so she can exhibit positive behavioral functioning." *Id.* at 29. While Dr. Pepe recognized a relationship existed between Father and Child, Dr. Pepe "didn't see a strong parent and child relationship or a primary bond." *Id.* at 34. *See id.* at 33, 37. Dr. Pepe explained that Father and Child did not have a "closely connected relationship." *Id.* at 41-42. Rather, Dr. Pepe noted that Child viewed her foster father as "her primary and psychological parent." *Id.* at 31. As such, Dr. Pepe opined that severing any bond between Father and Child

would not have a detrimental effect on Child. *Id.* at 42. Conversely, Child would be "devastated" if she were removed from her foster father. *Id.* at 40.[8]

Hence, we conclude the trial court did not abuse its discretion in finding that Child's developmental, physical, and emotional needs and welfare favor termination of parental rights pursuant to Section 2511(b). *See T.S.M.*, 620 Pa. at 628, 71 A.3d at 267.

While Father may profess to love Child, a parent's own feelings of love and affection for a child, alone, will not preclude termination of parental rights. *In re Z.P.*, 994 A.2d at 1121. Child is entitled to permanency and stability. As we have stated, a child's life "simply cannot be put on hold in the hope that [a parent] will summon the ability to handle the responsibilities of parenting." *Id*. at 1125. Rather, "a parent's basic constitutional right to the custody and rearing of his child is converted, upon the failure to fulfill his or her parental duties, to the child's right to have proper parenting and fulfillment of his or her potential in a permanent, healthy, safe environment." *In re B., N.M.*, 856 A.2d 847, 856 (Pa.Super. 2004) (citation omitted).

Accordingly, based upon our review of the record, we find no abuse of discretion and conclude that the trial court properly terminated Father's parental rights under 23 Pa.C.S.A. § 2511(a)(2) and (b).

---

[8] Significantly, Ms. Bolger, Dr. Pepe, and counsel for Child all additionally reported that Child desired to be adopted and remain with her foster father. *Id.* at 23-24, 30-31, 56-57.

Order affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date:  8/13/2021